**Bernard ABRAMS, Plaintiff,**

**v.**

**LIGHTOLIER, INC., et al., Defendants.**

**Civ. No. 88-2906(AMW).**

United States District Court,
D. New Jersey.

Jan. 3, 1994.

Margaret L. Moses, Roseland, NJ, Susan M. Singer, Newark, NJ, Gabriella Jordan, New York City, and Linda P. Torres, Newark, NJ.

## OPINION AND ORDER

PISANO, United States Magistrate Judge:

## INTRODUCTION

By consent of the parties, pursuant to 28 U.S.C. § 636(c) and Local Rule 40, a civil jury trial was conducted before the undersigned in the above captioned matter, commencing on October 4, 1993 and ending on October 19, 1993. At the conclusion of the presentation of the evidence and argument, the jury returned a verdict for plaintiff in the amount of $489,000. On November 3, 1993, judgment was entered in the amount of $606,806.91, representing the jury's verdict in addition to $117,806.91 in prejudgment interest.

This court is now asked to decide defendant's post-trial motion for judgment as a

matter of law, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, and, in the alternative, for a new trial, pursuant to Rule 59. Defendant also claims that the court erred in its calculation of prejudgment interest. Plaintiff filed opposition to defendant's motion and oral argument was heard on December 13, 1993.

**BACKGROUND**

This action, filed June 29, 1988, arises under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*, ("ADEA") and the New Jersey Law Against Discrimination, N.J.Stat.Ann. § 10:5-1, *et seq.* ("NJLAD"). This court has jurisdiction over plaintiff's ADEA claim pursuant to 28 U.S.C. § 1331 and exercises supplemental jurisdiction over plaintiff's pendent NJLAD claim pursuant to 28 U.S.C. § 1367(a).

Plaintiff, Bernard Abrams, was employed with Lightolier, Inc., from January 1970 until July 3, 1986.[1] Defendant Lightolier hired plaintiff as a Manager of Physical Distribution. From 1982 through July 3, 1986, plaintiff held the position of Vice President of Coastal Fast Freight, an in-house trucking company that was a subsidiary of Lightolier.[2] In 1981, plaintiff organized Team Purchasing, a system of combining the purchasing power of a number of companies in order to obtain significant price reductions. Plaintiff headed this system until late 1985. During the years of 1983 and 1984, Lightolier gave plaintiff primary responsibility for negotiating real estate transactions. Plaintiff asserted that between 1982 and 1986, he regularly received ample salary increases and bonuses.

In July 1985, plaintiff had coronary bypass surgery. He returned to work part-time in September of 1985, and full-time in November. Plaintiff claimed that when he returned to work in the fall, defendant began to restrict his job responsibilities. Among other things, plaintiff claimed that:

1. he was removed as the head of Team Purchasing;
2. he was not considered for a promotion to the position of Vice President of Administration at Genlyte;
3. his secretary was assigned to another officer, one of his subordinates was fired, and plaintiff was not permitted to replace either; and
4. he was given no further real estate responsibilities.

Plaintiff was fired on July 3, 1986. Plaintiff alleged that his termination was the result of a campaign to eliminate older workers. In support of his claims, plaintiff cited similar terminations, effective and direct, of other older Lightolier employees. Plaintiff also offered testimony that Richard Kurtz, the vice-president of operations whom plaintiff claimed spearheaded the campaign to rid Lightolier of older workers, referred to older workers as "dinosaurs" and spoke of the need to replace older workers with more aggressive ones.

Defendant professed that the true reasons for plaintiff's termination arose from his involvement with EZ Freight Co./Midland Transportation Co., Inc. In December of 1979, plaintiff executed a contract as Lightolier's authorized agent (the "1980 contract") with EZ Freight Company, a freight carrier company.

In June 1980, plaintiff orally modified the 1980 contract, changing the applicable freight rates. This rate change purportedly saved Lightolier approximately $249,000. EZ billed at the modified rate for the duration of the contract, a period of approximately six months, and Lightolier performed by paying the invoices based upon the new rates. In 1981 EZ Freight filed for bankruptcy and Midland Transportation Co., Inc. ("Midland") became EZ's successor in interest. In November 1981, Midland sent a letter to Lightolier essentially claiming that the oral modi-

1. The Genlyte Group was formed in 1985, as a wholly owned subsidiary of Bairnco Corp. Lightolier merged into Genlyte in 1991. The parties have referred to Lightolier and Genlyte interchangeably as "defendant". Therefore, this court will refer to Lightolier and Genlyte collectively as "defendant".

2. Beginning in March of 1981, part of plaintiff's salary was paid by Lightolier and part by Coastal Fast Freight.

fication was invalid and that Lightolier owed Midland $249,000. The letter also demanded payment for detention charges.[3] The 1980 and 1981 contracts had not included an agreement whereby Lightolier was to pay Midland detention charges. However, the tariffs filed by Midland and approved by the Interstate Commerce Commission ("ICC") provided for detention payments.

After Lightolier refused to pay either the $249,000 or the detention charges, Midland commenced suit on May 18, 1982 in the Superior Court of New Jersey, Hudson County. Defendant claims it discovered during the course of the litigation that plaintiff failed to memorialize in writing the afore-mentioned oral modification and failed to review the tariffs approved by the ICC. Moreover, allegations surfaced that plaintiff had accepted bribes from Steve Moallem, an employee of EZ and Midland.[4] Fred Heller, president of Lightolier at the time in question, claims that he declined to terminate plaintiff prior to trial in the Midland action because plaintiff was a crucial Lightolier witness whom Mr. Heller feared would become hostile and uncooperative if fired. In June 1986, Lightolier settled the Midland action for $300,000. Lightolier's attorneys' fees and litigation costs totalled approximately another $700,000, thus rendering the entire Midland affair an expense of nearly one million dollars.

Defendant claimed that plaintiff's July 1986 termination was due to his lack of judgment regarding the oral modification, his failure to review the tariffs containing the detention charges [5], his acceptance of bribes [6], and the cost and embarrassment caused by the Midland trial. Following plaintiff's termination, his duties were assumed by Donald Kutlick, a forty year old employee who had been a traffic manager at Lightolier since April 1985.

## ANALYSIS

### I. Rule 50—Judgment as a Matter of Law

Rule 50(a)(1) provides:

> If during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion, for judgment as a matter of law against that party on any claim, counterclaim, cross-claim, or third party claim that cannot under the controlling law be maintained without a favorable finding on that issue.

Rule 50(b) provides for post-trial renewal of motions made under 50(a). The standard for deciding the motion is the same whether it is made at trial or afterwards. *Neville Chem. Co. v. Union Carbide,* 422 F.2d 1205, 1210, n. 5 (3d Cir.1970), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1971).

When deciding a motion for judgment as a matter of law, "the trial judge must determine whether the evidence and justifiable inferences most favorable to the prevailing party afford any rational basis for the verdict." *Bhaya v. Westinghouse Elec. Corp.,* 832 F.2d 258, 258–59 (3d Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). *See also Rotondo v. Keene Corp.,* 956 F.2d 436 (3d Cir.1992). The motion should be denied if "the record contains the minimum quantum of evidence from which a jury might reasonably afford relief." *Keith v. Truck Stops Corp.,* 909 F.2d 743, 745 (3d Cir.1990). *See also Dawson v. Chrysler Corp.,* 630 F.2d 950, 959 (3d Cir. 1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981) (denial of motion affirmed "unless record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief"). In *Brady v. Southern Railroad,* 320 U.S. 476,

3. Detention refers to time periods when the carrier is unreasonably delayed by the shipper.

4. Plaintiff disputed that the gifts and favors he accepted from Mr. Moallem were bribes.

5. Plaintiff claimed at trial that he had reviewed the tariffs and took no action because the language concerning detention was "boilerplate."

6. During the Midland trial, counsel for defendants attempted to assert a commercial bribery defense and called on plaintiff to testify. Plaintiff claims that defendants viewed him as expendable because of his age and set him up as a scapegoat at trial.

479–480, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943), the United States Supreme Court set forth the standard for a Rule 50 motion:

> When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine the proceedings by non-suit, directed verdict or otherwise in accordance with the applicable practice without submission to the jury, or by judgment notwithstanding the verdict. By such direction of the trial, the result is saved from the mischance of speculation over legally unfounded claims.

*Id.* at 479–80, 64 S.Ct. at 234.

**A. Whether this Court Charged the Correct Causation Standard under the New Jersey Law Against Discrimination.**

The court instructed the jury to apply two separate and distinct standards of causation for plaintiff's claims under the ADEA and the NJLAD. The jury found in favor of plaintiff on his claim under the NJLAD and in favor of defendant on plaintiff's ADEA claim. Defendant argues that the court erred in charging different standards of causation and that the standard charged under the ADEA should also have been applied to the NJLAD.

Having found that the instant case is a pretext case [7], the court instructed the jury that to render a verdict for plaintiff under the ADEA, it must find age to be "the sole motivating factor for the [d]efendants' decision to terminate [plaintiff's employment]." The court charged this standard pursuant to *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 472 (3d Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993) ("*Griffiths*"). In *Griffiths* the Third Circuit held that to prevail in a pretext case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to § 2000e–17 ("Title VII") [8], a terminated plaintiff must prove that discrimination was the sole motive for the termination. *Id.* at 472. Prior to *Griffiths*, liability would attach in a Third Circuit pretext case if it was found that discrimination played a determinative or a substantial role in the plaintiff's dismissal, although there might also have been concurrent legitimate motivations. *See Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992) (plaintiff-employee has burden of persuading fact finder that age was a determinative, though not necessarily the sole, factor).

Defendant essentially argues that the "sole motivating factor" test *Griffiths* applied to Title VII pretext cases subsumes state law and applies to pretext cases arising under the NJLAD. However, pursuant to the doctrine articulated in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (state law governs substantive issues arising from state claims in federal actions), this court instructed the jury that to find for plaintiff under the NJLAD, it must find that age was "a determinative factor" in plaintiff's termination. This court based its instruction on the causation test set forth in *Slohoda v. United Parcel Service, Inc.*, 207 N.J.Super. 145, 504 A.2d 53, 59 (App.Div.1986) (discriminatory purpose must be a "determinative factor").

The New Jersey courts have not yet addressed whether *Griffiths* applies to the NJLAD. When determining the law applicable to a pendent state claim, "[i]n the

7. The trial court is required to make a preliminary finding as a matter of law, as to whether the proofs characterize the case a pretext or a mixed motives case. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 247, n. 12, 109 S.Ct. 1775, 1789, n. 12, 104 L.Ed.2d 268 (1989). In a pretext case, the employee argues that the employer's facially legitimate reason for the employment decision was false, and therefore that the real reason was discrimination. *Price Waterhouse*, 490 U.S. at 247, 109 U.S. at 1789. *See also St. Mary's Honor Center v. Hicks*, — U.S. —, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (jury may infer discrimination from pretext). In a mixed motives case, the plaintiff concedes that the legitimate motives articulated by an employer played a factor in the adverse employment decision. However, the plaintiff argues that additional, improper motives also played a role in causing the decision. *Price Waterhouse*, 490 U.S. at 241–45, 109 S.Ct. at 1786–88. For purposes of this motion, the parties do not dispute the court's finding that this is a pretext case.

8. The order of proof in a suit under the ADEA mirrors that in a Title VII action. *Pierce v. New Process Co.*, 580 F.Supp. 1543, 1544 (W.D.Pa. 1984), *aff'd*, 749 F.2d 27 (1985).

absence of an authoritative pronouncement from the state's highest court, the task of a federal tribunal is to predict how that court would rule." *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1167 (3d Cir.1981). Decisions of a state's lower appellate courts are presumptive evidence of state law. *Carrington v. RCA Global Communications, Inc.,* 762 F.Supp. 632, 642–43 (D.N.J.1991).

In *Griffiths,* the Third Circuit applied the "sole motivating factor" test to the plaintiff's claims under the Pennsylvania Human Relations Act ("PHRA") as well as to his Title VII claim. The court acknowledged the absence of a Pennsylvania state court decision establishing whether a "motivating" or "significant" factor level of causation would suffice under the PHRA. *Griffiths,* 988 F.2d at 471, n. 14. Apparently, the failure of the Pennsylvania courts to articulate a causation standard under the PHRA was crucial to the Third Circuit's conclusion that Pennsylvania state courts would follow federal decisions on causation. *Id.*

In contrast, the New Jersey Appellate Division has set forth the causation standard a plaintiff must meet in a pretext case under the NJLAD. The Appellate Division specifically explained in *Slohoda,* a pretext case, that "... for purposes of the [NJLAD] plaintiff need not prove that the termination was motivated solely by a discriminatory purpose. It is sufficient if, taken with other possibly meritorious reasons, the discriminatory purpose was a '*determinative factor.*'" *Slohoda,* 504 A.2d at 59 (emphasis supplied).

This court is not persuaded that the New Jersey State Supreme Court would disavow the standard enunciated in *Slohoda* to find that the NJLAD warrants application of the "sole motivating factor" test in pretext cases. This court observes that on several occasions the New Jersey State Supreme Court has explicitly declined to follow Title VII precedent when interpreting the NJLAD, *see Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 626 A.2d 445, 452 (1993), and has particularly eschewed "slavish devotion" to the *McDonnell Douglas* test, *see Grigoletti v. Ortho Pharmaceutical Corp.,* 118 N.J. 89, 570 A.2d 903, 912 (1990); *cf. Erickson v. Marsh & McLennan,* 117 N.J. 539, 569 A.2d 793 (1990); *Andersen v. Exxon Co.,* 89 N.J. 483, 446 A.2d 486 (1982).

*Grigoletti* is an especially good example of the New Jersey Supreme Court's refusal to hold that the NJLAD tracks Title VII precedent in every instance. *Grigoletti* concerned an NJLAD gender-discrimination claim based on the payment of unequal wages for substantially equal work. The defendant claimed that the Appellate Division had erred in utilizing an Equal Pay Act analysis rather than the *McDonnell Douglas* standard. *Grigoletti,* 570 A.2d at 911. Stating that it "has not hesitated to depart from the *McDonnell Douglas* methodology if a rigid application of its standards is inappropriate under the circumstances," the New Jersey State Court held that application of the Equal Pay Act analysis was proper under the circumstances presented by the case, *Id.* at 912.

Moreover, this court notes that the New Jersey Supreme Court looks to federal law generally for useful analogy in interpreting the NJLAD, and does not give particular deference to Third Circuit Law. For example, in *Toys 'R' Us,* the Court explicitly rejected the test the Third Circuit set forth in *Andrews v. City of Philadelphia,* 895 F.2d 1469 (3d Cir.1990) to prove existence of a hostile work environment under Title VII. *Toys 'R' Us,* 626 A.2d at 453, 455. The Court also considered a split among the federal circuits on the level of harm a plaintiff must show to state a valid hostile work environment claim. NJLAD. *Id.* at 455–56. Rather than showing deference to the law of any particular circuit, the Court made its determination based on the line of cases it deemed more consistent with the NJLAD. *Id.* at 456.

In light of this eclectic approach to interpreting the NJLAD, it is important to note that other circuits apply causation standards closer to *Slohoda* than to *Griffiths. See, e.g., Levin v. Analysis & Technology, Inc.,* 960 F.2d 314, 317 (2d Cir.1992) (in pretext case under ADEA, plaintiff need show only that age was a "determinative factor"); *Castelman v. Acme Bom. Co.,* 959 F.2d 1417, 1420 (7th Cir.1992) (plaintiff need show only that age was a "but for" factor); *Loeb v. Textron,*

*Inc.*, 600 F.2d 1003, 1019 (1st Cir.1979); *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 233 (4th Cir.1991) ("but for" standard).

This court believes that, if presented with the question, the New Jersey Supreme Court would decline to follow *Griffiths* and would affirm the "determinative factor" standard set forth in *Slohoda* and the afore-mentioned federal circuits. The New Jersey appellate courts have been pace-setters in the area of employee rights. *See, e.g., Toys 'R' Us, supra; Gimello v. Agency Rent-A-Car Systems, Inc.*, 250 N.J.Super. 338, 594 A.2d 264 (App.Div.1991) (holding that obese persons may be considered handicapped under the NJLAD). In keeping with the liberal construction afforded the NJLAD, *see Clowes v. Terminix Int'l, Inc.*, 109 N.J. 575, 590, 538 A.2d 794 (1988), the New Jersey Supreme Court could easily reject the analysis set forth in *Griffiths,* just as it rejected the Third Circuit's analysis in *Andrews, supra.*

Therefore, this court declines to grant defendant's Rule 50(a) motion on the basis that *Griffiths'* "sole motivating factor" test should have been applied to the NJLAD charge. The charge conformed to the test the Appellate Division explicitly mandated in *Slohoda.* Because it was necessary for this court to instruct the jury as to the different federal and state causation standards, this court finds that defendant was not unduly prejudiced by the giving of separate causation charges.

**B. Whether the Evidence Presented at Trial Entitles Defendant to Judgment as a Matter of Law.**

As a preliminary matter, the court must address plaintiff's contention that defendant's motion for judgment as a matter of law exceeds the scope of Rule 50(b). Plaintiff claims that the only ground raised by defendant's counsel under Rule 50(a) at the close of trial was that plaintiff could not meet the standard set forth in *Griffiths.* Citing *Kientzy v. McDonnell Douglas,* 990 F.2d 1051, 1061 (8th Cir.1993) (a motion made under Rule 50(b) cannot be based on new grounds), plaintiff argues that because no other ground was specified, and because the jury did not find that plaintiff had met the *Griffiths* standard, defendant has no basis for renewing its trial motion. The court rejects plaintiff's argument and finds that defendant has not waived the full scope of its Rule 50(a) motion. Defendant's position was consistent throughout trial. Defendant's renewal of its Rule 50(a) motion at the close of trial clearly does not serve to limit the scope of that motion.

Defendant does not dispute that plaintiff established a *prima facie* case of age discrimination under the NJLAD. Rather, defendant contends that no reasonable jury could find defendant's proffered reasons for terminating plaintiff's employment to be both false and pretextual. After a careful review of the evidence presented, this court finds that plaintiff did set forth sufficient evidence from which a reasonable jury could conclude that age discrimination was a determinative factor in plaintiff's termination.

This court accepts the jury's determinations as to the credibility of defendant's witnesses. Moreover, plaintiff presented evidence that there was a company policy disfavoring older employees. Several elderly former employees of Lightolier, including plaintiff, testified to being "forced out" by Lightolier and by Richard Kurtz in particular. Plaintiff offered evidence to show that Richard Kurtz, plaintiff's supervisor, influenced the employment decisions affecting him. For example, Kurtz refused to let plaintiff replace subordinates working for plaintiff, including plaintiff's secretary. Carolyn Sebastian's testimony that Kurtz termed older employees "dinosaurs" revealed Kurtz' state of mind. Plaintiff testified that Kurtz stated in plaintiff's presence "things w[ill] begin to hum around here when we [get] rid of the old fogies." Based on the totality of the evidence presented at trial, this court declines to grant defendant's motion for judgment as a matter of law on the issue of liability.

**II. Rule 59(a)—Motion for a New Trial**

Rule 59(a) provides in pertinent part:

> A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for

which new trials have heretofore been granted in actions at law in the courts of the United States....

As recently reiterated in *Olefins Trading Inc. v. Han Yang Chemical Corp.*, 9 F.3d 282, 289 (3d Cir.1993), a district court's discretion to grant a new trial motion is limited to those circumstances where a miscarriage of justice would result if the verdict were to stand. (citations omitted). The purpose of this policy is to ensure that the trial court does not supplant the jury verdict with its own. *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 211 (3d Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993) (citing *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir.) (*in banc*), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)).

**A. Whether the Verdict Is Supported by the Weight of the Evidence; Whether this Court's Evidentiary Rulings Require a New Trial**

Defendant claims that the jury's verdict is not supported by the weight of the evidence. Based on a review of the record, for the reasons discussed in determining whether to grant defendant's Rule 50 motion, this court finds that the jury's verdict is supported by the weight of the evidence.

Defendant also objects to numerous evidentiary rulings made by this court.[9] After careful consideration, this court finds that its prior rulings were proper. In particular, defendant argues that admission of an Equal Employment Opportunity Commission ("EEOC") Letter of Determination (Pl.'s Ex. 1) finding that defendant violated the ADEA warrants a new trial. Defendant claims that the Letter is unreliable, *see* Fed.R.Evid. 803(8)(C), and that admission of it unduly prejudiced defendant, *see* Fed.R.Evid. 403.

This court based its ruling on *Abrams v. Lightolier*, 702 F.Supp. 509 (D.N.J.1988), in which Judge Wolin addressed the admissability of the EEOC letter at issue here. Defendant moved in the alternative for dismissal of the complaint pursuant to Rule 12(b)(6) or for an order striking from the complaint any reference to the EEOC letter. Citing *Plummer v. Western Int'l Hotels Co.*, 656 F.2d 502 (9th Cir.1981) and its progeny, Judge Wolin stated that EEOC findings are generally more probative than prejudicial, and should be admitted absent a showing that a specific finding is particularly untrustworthy. *Id.* at 512. Judge Wolin further found that:

> [n]o such showing [of untrustworthiness] has been made here.... Nevertheless, given the lingering potential for prejudice, the Court will, at the appropriate time, entertain a jury instruction to ensure that the jury does not deem the EEOC determination dispositive..... The Court has complete confidence that the jury, guided by such a charge, will not give the EEOC letter undue weight.

*Id.*

Defendant now claims that the EEOC Letter is untrustworthy, mainly because the author's conclusions were contrary to *St. Mary's Honor Center v. Hicks, supra.* This argument is not persuasive. The findings in the EEOC letter are within the scope of *Hicks.* Although *Hicks* held that a finding of pretext does not compel judgment for the plaintiff, the Court stated that the plaintiff's *prima facie* case, coupled with proof of pretext, may support a verdict in favor of the plaintiff. *St. Mary's Honor Center*, — U.S. at —, 113 S.Ct. at 2749. Consistent with *Hicks,* the EEOC found that this *prima facie* case, coupled with evidence of pretext, provided probable cause that discrimination had occurred.

Moreover, any taint or prejudice surrounding the EEOC letter was adequately cured by this Court's repeated instructions that: (1) the EEOC findings may or may not be correct; (2) the findings were not binding; (3) the EEOC did not conduct a hearing; (4) witnesses were not required to give sworn testimony under penalty of perjury; (5) parties were not necessarily aware of information given the EEOC by other parties; (6) there was no opportunity to cross-examine

9. Most of defendant's arguments were raised prior to trial as motions *in limine*. The court orally ruled on these motions on September 13, 1993.

witnesses; (7) the parties could not compel testimony of witnesses; (8) the EEOC has no power to require a party to pay damages; and (9) the jury must base its decisions on the law in which it was instructed, not on the law upon which the EEOC may have relied. This court is confident that its strongly worded instruction prevented the jury from affording the EEOC letter undue weight.

**B. The Damages Award**

**1. Plaintiff's $100,000 Award for Pain and Suffering**

The jury awarded plaintiff $100,000 for pain and suffering. While this court declines to find that the pain and suffering award is wholly unsupported by the evidence, it finds that remittitur is appropriate. Remittitur is proper where no clear judicial error or "pernicious influence" can be identified, but where the verdict is so large as to shock the conscience of the court. *Kazan v. Wolinski,* 721 F.2d 911, 914 (3d Cir.1983).

Under the NJLAD, a plaintiff may recover damages for pain, suffering, humiliation, or mental anguish experienced as a direct result of a discriminatory act. N.J.Stat.Ann. § 10:5–13. New Jersey courts have been careful to award such damages only in cases where the record demonstrates a "substantial basis for compensation." *Castellano v. Linden Bd. of Ed.,* 79 N.J. 407, 400 A.2d 1182, 1184 (1979). Awards for pain and suffering have generally been nominal, ranging from $500 to $1500.[10]

The only evidence of plaintiff's actual mental distress is his testimony regarding the impact the loss of his job had on him:

> . . . it has been a very upsetting thing to be accused in secret of bribery, to a company that you've worked for, without even the courtesy of being told about it.
>
> It has been very unnerving, unpleasant and distressing to have somebody tell you that you can't have a job because you are not up to it physically.... [a]nd I have really been very, very, very upset by the whole thing.

(Tr. Vol. III at 288.3–14).

The record does not contain any evidence that plaintiff sought psychological counseling to cope with his distress.

The instant case presents issues similar to those before the Appellate Division in *Jackson v. Consolidated Rail Corp.,* 223 N.J.Super. 467, 538 A.2d 1310 (App.Div.1988). *Jackson* illustrates that awards for emotional distress under the NJLAD are not exempt from the fundamental requirement of being supported by the evidence adduced at trial.

In *Jackson* the jury awarded the plaintiff $500,000 in damages for emotional distress based on the plaintiff's testimony that he was ashamed and upset upon being discharged from his job. *Id.* 538 A.2d at 1316. The plaintiff did not seek psychological help until one month before trial, five years after his discharge. *Id.* The psychologist whom the plaintiff consulted on two occasions testified that as to the plaintiff's depression and opined that the plaintiff needed further psychological counseling. *Id.*

The trial judge ordered a new trial on the compensatory damage award, finding it so disproportionate to the injuries described as to constitute a manifest injustice. *Id.* at 1317. The judge recognized that the plaintiff's emotional distress was real and painful, yet found that " 'the severity of the distress from the testimony of the plaintiff himself was not of such a degree to warrant the judgment of over half a million dollars.' " *Id.* The Appellate Division upheld the grant of a new trial on compensatory damages, stressing that the plaintiff had not undergone psychiatric or psychological treatment until shortly before trial. *Id.*

The instant case is also akin to *Castellano,* in which a pain and suffering award of $600 under the NJLAD was found to have been unsupported by the evidence. The award was apparently based on plaintiff's response

10. *See, e.g. Rogers v. Campbell Foundry Co.,* 185 N.J.Super. 109, 447 A.2d 589 (App.Div.1981), *cert. denied,* 91 N.J. 529, 453 A.2d 852 (1982) ($750); *Andersen v. Exxon Co.,* 89 N.J. 483, 446 A.2d 486 (1982) ($500); *Goodman v. London Metals Exchange, Inc.,* 86 N.J. 19, 429 A.2d 341 (1981) ($750); *Director, Div. on Civil Rights v. Slumber, Inc.,* 82 N.J. 412, 413 A.2d 603 (1980) ($1500).

to a question about her personal reaction to the discrimination in question:

> First upset—I couldn't believe it, I couldn't believe that this was happening to me. I saw no basis for this. Upset. Cried. Stayed in the house for a while. [I was upset] [b]ecause I didn't think that something like this could happen to me. I was afraid of the way people would react to me; just the whole thing. the whole—just upset me.
>
> Q. Did you cry on one occasion or on more than one occasion?
>
> A. No, many.
>
> Q. How long a period would you say this upset lasted?
>
> A. Oh, a couple of weeks, I guess.

*Castellano,* 400 A.2d at 1184. The New Jersey Supreme Court recognized that the award was not substantial, but found that the foregoing evidence in support of it was nebulous. *Id.*

This court also finds *Andersen* instructive to the case at hand. In *Andersen v. Exxon,* the majority upheld what it deemed a "moderate token" award of $500 for emotional distress in an NJLAD suit where the plaintiff indicated that he was emotionally distressed. *Andersen,* 446 A.2d at 496. In a dissent joined by Justice Pollock, Justice Schreiber explained that the award was:

> simply not supportable. It is based on one sentence, nonresponsive to the question, in the entire record. [The plaintiff] testified as follows:
>
> Q. Now, after you left Dr. Butenas did you go see anyone, did you go back to Mr. Sullivan.
>
> A. No, I just went home very depressed and then I went back to him one day, though, to ask him, you know, why I couldn't be hired, is there something that could be done. He just said in sort of angry words, he says, well I'm just sorry, but his word is law.

*Id.* at 501, (Schreiber, J., dissenting).

The parties refer to two cases in which pain and suffering awards exceed $1500. *See Levinson v. Prentice-Hall, Inc.,* 868 F.2d 558 (3d Cir.1989) ($100,000 awarded for emotional distress where facts of case, including that plaintiff was subjected to ridicule because he had multiple sclerosis, supported punitive damage); *Gimello v. Agency Rent-A-Car Systems, Inc.,* 250 N.J.Super. 338, 594 A.2d 264 (App.Div.1991) ($10,000 award for pain and suffering where supervisors ridiculed plaintiff because of plaintiff's handicap). These cases are distinguishable from the instant case in that the evidence to support the awards was far more compelling than the evidence presented here and the mental suffering awards were not challenged on appeal.

Review of the relevant case law reveals that the evidence in the instant case provided the basis for only a nominal mental distress award. Given the paucity of evidence regarding plaintiff's actual mental distress, this court finds that the award of $100,000 is grossly excessive. The award is excessive to the extent that it exceeds $2,500. The court orders a new trial subject to plaintiff's agreeing to remit $97,500 of the mental distress award to defendant.

## 2. Mitigation

The jury awarded plaintiff $308,000 in back pay damages. Finding that plaintiff failed to exercise reasonable diligence to mitigate his damages, and that there was a reasonable likelihood that plaintiff might have found comparable work if he had exercised reasonable diligence, the jury then subtracted $13,000 from plaintiff's back pay award.[11] Citing federal case law, defendant urges that the back pay and front pay awards be stricken because "back pay

11. Question 5 of the Verdict Form was returned as follows:

> 5. *Did Lightolier prove by a preponderance of the credible evidence (A) that Mr. Abrams' [sic] failed to exercise reasonable diligence to mitigate his damages, and (B) that there was a reasonable likelihood that plaintiff might have found comparable work if he had exercised reasonable diligence.*
>
> YES X NO _
>
> If "NO", proceed to Question 6. If "YES", you may, but are not required, to set forth below an amount to be deducted from the amount of backpay you awarded in response to Question 4.
>
> $13,000.

awards under the ADEA are ... subject to the requirement that plaintiffs mitigate their damages." (Def.'s Br. in Supp. of Post–Trial Mots.).

Defendant overlooks that plaintiff was awarded back pay under the NJLAD, not the ADEA. Mitigation is an affirmative defense and the *Erie* doctrine mandates that this court apply state law to determine the effect of plaintiff's failure to mitigate.

In *Goodman v. London Metals Exchange, Inc.,* 86 N.J. 19, 429 A.2d 341, 349 (1981), the New Jersey Supreme Court held that back pay awards under the NJLAD are subject to the principles of mitigation. The burden of proving failure to mitigate rests on employer defendants such as Lightolier. *Id.* 429 A.2d at 352. *Goodman* set forth the proper order of proofs:

> The employer may establish a *prima facie* case by first showing that comparable employment opportunities were available.... The burden of going forward would then shift to the employee who may introduce evidence that comparable employment did not exist, that reasonable and diligent efforts on his part had not been successful, or that the circumstances did not justify acceptance of a dissimilar job. Whether the individual sought a job or not would be irrelevant in the absence of the existence of a position.... The ultimate burden of persuasion rests on the employer.

*Id.* at 352–353.

*Goodman* refers to the failure of a plaintiff to mitigate as resulting in a "reduction" of the back pay award. *Id.* at 352, n. 3, 353. Neither *Goodman,* nor any other New Jersey case of which the court is aware, supports defendant's position that in failing to mitigate his damages, plaintiff has waived his right to any award for front pay or back pay.

Sufficient evidence was presented at trial whereby the jury could determine that $13,000 represented the proper reduction for plaintiff's failure to mitigate. Upon his termination, plaintiff sought a corporate position in the field of physical distribution. Plaintiff responded to advertisements, contacted employment agencies, and approached people he knew in his field. He received few responses, went on two interviews, and failed to garner any offers. Within a few months of termination, plaintiff started an independent consulting firm in the field of physical distribution that plaintiff continues to operate.

While continuing to search for a corporate position, plaintiff also took a position as an adjunct professor at Montclair State College. In 1989, while plaintiff continued to look for a corporate position, he acquired a full-time teaching position at St. Peters College. In 1990, plaintiff's income totalled $58,751, a sum close to the $65,879 plaintiff's expert projected he would have received at Lightolier at that time. Plaintiff's income totalled $37,932 in 1991 and $32,709 in 1992. Plaintiff's expert witness estimated that plaintiff's apportioned income as of September 1993 amounted to $23,986. In her summation, counsel for plaintiff admitted that plaintiff ceased actively searching for a corporate position in 1990.

The jury was not asked to specify a time period for which plaintiff failed to mitigate his damages. Based on the jury's reduction of only $13,000, it appears that the jury considered 1992 to be the year in which plaintiff first failed to mitigate his damages. In 1992 plaintiff made considerably less than he would have at Lightolier and did not look for a corporate position. Because the jury's reduction of $13,000 was not unreasonable in light of the evidence presented, this court declines to order a new trial.

### 3. Back Pay Award

Defendant initially argues that the $308,000 award of back pay is itself unreasonable. Defendant contends that the award exceeds the amount calculated by plaintiff's expert, $295,589, and is therefore excessive. However, this court finds that there sufficient evidence exists to support an award of $308,000.

To determine the amount of plaintiff's back pay award, plaintiff's expert used the projections of defendant's expert as to what plaintiff's Lightolier income would be from 1986 through 1993. Defendant's expert projected a salary increase of only 2.2% each year, and an actual decrease in overall compensation during one year. The jury could have found

that these numbers were inconsistent with plaintiff's salary history prior to his discharge, which did not include any decreases.

Moreover, evidence was presented from which the jury could have determined that plaintiff's job responsibilities put him at a salary grade level higher than that used by either expert. At the time in question, salary increases at Lightolier depended upon the salary grade into which an employee fell. Employees in higher salary grades were given higher salary increases. Plaintiff's position was unique in that no other employee had similar responsibilities and plaintiff was not assigned a salary grade level. Plaintiff's expert estimated plaintiff's salary grade level to be a "nineteen," while defendant's expert contended that plaintiff's grade level was an "eighteen."

Steven Klosk, the vice-president of human resources under whose supervision the salary grade system was instituted, testified at trial that plant managers were graded in the low "twenties." Defendant's current vice-president of administration, Donna Ratliff, testified that the salary grade of the supervisor to whom an employee reported was a factor in determining the employee's salary grade level. The testimony of Richard Kurtz, vice-president of operations, established that both plant managers and plaintiff reported directly to him. This testimony could have led the jury to determine that plaintiff's salary grade was equivalent to that of a plant manager.

Defendant also argues that the back pay award is excessive because it is based on gross, rather than net, income. Defendant contends that calculation of plaintiff's award on this basis results in an impermissible windfall to plaintiff, who now retains the amount he would have paid in taxes had he not been terminated.

Defendant fails to cite, and this court has not found, any state cases which indicate that the NJLAD requires back pay awards to be calculated on net income. Based on defendant's failure to show why it should do otherwise, this court specifically instructed the jury that its award was to be calculated on the basis of gross, not net, income. Although the parties do not dispute that plaintiff's NJLAD back pay award is excludable from taxable income, because there is no case so holding, the court will undergo the following analysis.

Section 104(a)(2) of the Internal Revenue Code, provides that gross income does not include "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness...." 26 U.S.C. § 104(a)(2). The key to exclusion under section 104(a)(2) is that the damages in question must be derived from a tort or tort-like claim against the payor. *United States v. Burke,* — U.S. —, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992). This court concludes that back pay awards under the NJLAD are tort-based remedies and are therefore excludable from gross income pursuant to section 104(a)(2).

Age discrimination claims under the NJLAD are appropriately analyzed by examination of federal cases arising under Title VII and the ADEA. *Giammario v. Trenton Bd. of Educ.,* 203 N.J.Super. 356, 497 A.2d 199, 202 (App.Div.1985), *cert. denied,* 102 N.J. 336, 508 A.2d 212 (1986). Recently in *Burke,* — U.S. at —, 112 S.Ct. at 1873 (1992), the Supreme Court held that back pay awards under Title VII are not excluded from income under section 104(a). In determining that back pay awards under Title VII are not tort-based, the Court noted that Title VII focuses on "legal injuries of an economic character" and does not allow awards for compensatory or punitive damages. *Id.*

In contrast, both before and after *Burke,* several circuits have held that awards under the ADEA address tort-like injuries and are therefore not taxable. *See Purcell v. Sequin State Bank & Trust Co.,* 999 F.2d 950 (5th Cir.1993); *Redfield v. Insurance Co. of N. Am.,* 940 F.2d 542 (9th Cir.1991); *Pistillo v. Commissioner,* 912 F.2d 145 (6th Cir.1990); *Rickel v. C.I.R.,* 900 F.2d 655 (3d Cir.1990). In this respect, the NJLAD is more like the ADEA than Title VII. The NJLAD addresses damages for "economic loss and emotional trauma ... time loss, physical and emotional stress and severe emotional illness, all of which are traditional elements of compensatory damages in common law tort ac-

tions." *Milazzo v. Exxon Corp.*, 243 N.J.Super. 573, 580 A.2d 1107, 1108 (Law Div.1990). Clearly, awards under the NJLAD, including back pay, address tort-like injuries and are therefore not taxable.

Having determined that plaintiff's back pay award is not taxable, pursuant to the federal income tax exclusion for personal injury awards, this court must now decide which party should reap the benefit of that exclusion. This issue arose in *Redfield, supra,* in which the employer defendant withheld taxes from the plaintiff's back pay award. The district court granted the defendant's motion for relief from final judgment, pursuant to Rule 60(b)(5) of the Federal Rules of Civil Procedure, on the basis that the defendant had paid all the monies due to the plaintiff. *Redfield,* 940 F.2d at 544. After finding that the back pay award was not taxable, the Ninth Circuit declared that the defendant's withholding of amounts for state and federal taxes was not justified, and remanded to the district court with instructions that the judgment should not be deemed satisfied until the plaintiff received the full amount of his award from the defendant, in addition to refunds or credits from the relevant tax authorities. *Id.* at 549.

The Third Circuit has also indicated that plaintiffs in age discrimination suits receive the benefits of the exclusion. *See Rickel,* 900 F.2d at 664. The plaintiff in *Rickel* appealed a Tax Court decision that one half of a settlement the plaintiff received in an ADEA suit represented taxable income. Reversing the Tax Court, the Third Circuit permitted the plaintiff to retain the entire award. *Id.* at 663–664. The court acknowledged that its holding would result in a windfall for successful plaintiffs:

> Of course it might be troubling to some that a successful plaintiff in an ADEA suit will make out better, vis-a-vis federal income tax liability, than if the plaintiff had not been discriminated against in the first place. Although this concern is understandable.... the successful ADEA plaintiff is being treated no better (or worse now) than the typical tort victim who suffers a physical injury.... We see no reason to treat one personal injury victim any differently than another. (citations omitted).

*Id.* at 664.

Citing *Rickel,* the court in *Murtha v. Forest Elec. Corp.,* Civ. A. No. 90–3259, 1992 WL 174606, at *11 (E.D.Pa. July 14, 1992) held that an ADEA plaintiff awarded back pay should receive the benefit of the exclusion:

> The traditional rule is that the wrongdoing party pays damages to the injured party, and the injured party gets the 'windfall.' Defendant's suggested approach to the issue—to reward the discriminating employer by allowing it to withhold federal taxes from the judgment without remitting the 'tax amount' to the government—is certainly unique, but we are not persuaded that it is a sound method of deterring discrimination. We prefer to follow the approach of the Court of Appeals [in *Rickel* ].

Moreover, in *Gallo v. John Powell Chevrolet, Inc.,* 779 F.Supp. 804 (M.D.Pa.1991), decided prior to *Burke,* the court relied on *Rickel* to hold that a back pay award under Title VII was not reducible by the federal income tax the plaintiff would have paid on the wages she earned. *Id.* at 813.

Although this issue has not been squarely addressed by the New Jersey courts, it appears that they have approved calculation of NJLAD back pay awards based on gross earnings. *See, e.g., Troxell v. New Jersey Turnpike Authority,* 92 N.J.Admin.2d 89, 1992 WL 276968 (1992) (back pay calculated on gross amounts complainant would have earned). Therefore, this court adopts the analysis set forth in *Redfield, Rickel, Murtha,* and *Gallo* and declines to order that plaintiff's back pay award be recalculated based on his net salary.

Finally, defendant argues that any pension benefits paid to plaintiff should have been deducted from his back pay award. This court is not aware of any case discussing whether pension benefits should be deducted from a back pay award under the NJLAD. Therefore, it is necessary to determine how the New Jersey State Supreme Court would rule on this issue. *See Pennsylvania Glass Sand Corp.,* 652 F.2d at 1167.

Both parties acknowledge that the Third Circuit has held that back pay awards under the ADEA shall not be reduced by pension benefits. *McDowell v. Avtex Fibers, Inc.,* 740 F.2d 214, 217 (3d Cir.1984), *vacated on other grounds,* 469 U.S. 1202, 105 S.Ct. 1159, 84 L.Ed.2d 312 (1985). The holding in *McDowell* was based on the Third Circuit's analysis in *Craig v. Y & Y Snacks, Inc.,* 721 F.2d 77 (3d Cir.1983). In *Craig,* the Third Circuit joined the Fourth, Ninth, and Eleventh Circuits in adopting the rule that unemployment benefits may not be deducted from a Title VII back pay award. *Craig,* 721 F.2d at 85. The *Craig* majority included the following reasons for its holding: (1) under the National Labor Relations Act ("NLRA"), on which Congress modelled Title VII's back pay provisions, unemployment benefits are not deducted from back pay awards; (2) permitting deduction of unemployment benefits would undercut Title VII's purpose of ending discrimination to the extent that the back pay award is reduced by unemployment compensation; (3) precluding deduction of unemployment benefits furthers the objective of Title VII's back pay provision to "compensate the injured victim's of discrimination in a make whole fashion". *Id.* at 84.

In *McDowell,* the Third Circuit first extended *Craig* to hold that unemployment benefits should not be deducted from back pay awards under the ADEA. It explained that "[i]n our view, the reasons supporting this court's decision concerning Title VII in *Craig* apply even more so to this case involving the ADEA.... [W]hile the ends of the two statutes are virtually identical, the ADEA back pay awards, unlike Title VII back pay awards, are not discretionary." *McDowell,* 740 F.2d at 217. The court went on to find that unemployment benefits were "indistinguishable" from pension benefits for purposes of deduction from back pay awards under the ADEA. *Id.* at 217, 218.

As with Title VII, the back pay provisions of the NJLAD are substantially similar to those of the NLRA. *Goodman,* 429 A.2d at 349. Moreover, the purposes for awarding back pay under the NJLAD and Title VII are the same: "to make the discriminatee whole by reimbursement of the economic loss suffered, [and] also [to] correlatively discourage and deter unlawful discrimination. *Id.* Given that the New Jersey State Supreme Court has acknowledged and relied on these similarities in interpreting the back pay provision of the NJLAD, this court finds that the State Supreme Court would likely adopt the well-reasoned analysis enunciated by the Third Circuit in *Craig* and *McDowell* to hold that pension benefits should not be deducted from back pay awards under the NJLAD.

**4. The Award for Future Losses**

The jury awarded plaintiff $94,000 in future losses, based on its calculation that plaintiff would suffer economic loss until November 6, 2006. Defendant contends that this award is excessive because plaintiff testified at trial that he intended to work until he was 70, an age he would reach in 1996. Defendant argues that the front pay award was therefore incorrectly calculated and should be reduced by 10/13 to reflect the evidence that plaintiff would have worked only until 1996.

However, it is appears that the award for front pay included compensation for plaintiff's lost pension benefits. The jurors specifically inquired whether they could include lost pension benefits in any award for future pay. (Tr. Vol. XIX at 1958, 1959). Defendant's expert testified that if plaintiff had retired at age 65, plaintiff's pension benefits would have totalled over $17,000 annually, rather than the $8000 he currently receives. (Tr. Vol. XIV at 1533, 1534). Plaintiff's expert testified that in 1986, plaintiff's life expectancy was "to age 77.4," and that his life expectancy at the time of trial was greater than that. (Tr. Vol. VII at 717). Therefore, this court finds that there was sufficient evidence to support the award for future losses.

**III. Prejudgment Interest**

This court awarded plaintiff prejudgment interest at the rate mandated by Rule 4:42–11(b) of the New Jersey Court Rules. Rule 4:42–11(b) provides in pertinent part:

> Tort Actions. Except where provided by statute with respect to a public entity or employee, and except as otherwise provided by law, the court shall, in tort actions

... include in the judgment simple interest, calculated as hereafter provide, from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later....

Defendant cites federal law for the proposition that awards of prejudgment interest are within a court's discretion and contends that this court erred both in awarding prejudgment interest and in calculating the award based on the interest rate prescribed by Rule 4:42–11(b). The great majority of defendant's arguments are based entirely on federal case law concerning prejudgment interest, and are thus inapplicable. Because plaintiff's award was based solely on his state law claim, the court must apply state law on the issue of prejudgment interest.

The Third Circuit has recognized that "the question of interest on a judgment arising out of [a] pendent state law claim [is to] be decided in accordance with state law." *Ambromovage v. United Mine Workers of America,* 726 F.2d 972, 981 n. 25 (3d Cir.1984). The First Circuit reached the same conclusion in *Doty v. Sewall,* 908 F.2d 1053, 1063 (1st Cir.1990):

... it is well settled that the application of *Erie* is not limited to cases in which federal jurisdiction is based on diversity of the parties, but is also extended to cases in which federal jurisdiction is conferred on pendent grounds to state law claims. (citations omitted). Thus ... 'when a [p]laintiff secures a jury verdict based on state law, the law of that state governs the award of prejudgment interest.' (citations omitted).

*Ambromovage* and *Doty* dictate that this court apply New Jersey law to determine whether prejudgment interest should be awarded and to calculate such award. The plain language of Rule 4:42–11(b), *supra* provides that prejudgment interest is mandatory in tort actions, absent exceptional circumstances. Because the NJLAD affords plaintiffs all remedies available in common law tort actions, Rule 4:42–11(b), "without question a 'remedy' available to common law tort actions," applies to claims under the NJLAD. *Milazzo,* 580 A.2d at 1108. Therefore, this court was correct in awarding prejudgment interest and in calculating the rate of that interest pursuant to Rule 4:42–11(b).

Defendant contends that the court calculated the award of prejudgment interest incorrectly. Defendant claims that the calculations used by the court erroneously provide for interest for income "lost" in the year in which it was lost. Defendant further argues that any such loss is not deemed to have occurred until December 31 of any particular year, and therefore that plaintiff is not entitled to interest on that amount until the following year. Defendant cites no authority for its position.

Defendant's method of calculation fails to account for the loss plaintiff suffered each month that he did not receive income. The calculations used by the court address this loss by providing for prejudgment interest on half the salary in a given year. Therefore, this court's award of prejudgment interest pursuant to Rule 4:42–11(b) is proper and does not warrant recalculation on this basis. However, the prejudgment interest award must be recalculated to reflect the reduced mental distress award.

## CONCLUSION

For the foregoing reasons defendant's Rule 50(b) motion is denied. Defendant's Rule 59 motion is granted only as to the issue of plaintiff's mental distress award. Plaintiff shall elect whether to remit $97,500 of the verdict or to submit to a new trial on the limited issue of damages. Plaintiff shall recalculate prejudgment interest based on the remittitur of the mental distress award and shall submit an appropriate amended form of judgment.

## ORDER

THIS MATTER comes before this court upon defendant's motions for judgment as a matter of law, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, and for a new trial or remittitur pursuant to Rule 59 of the Federal Rules of Civil Procedure. For the reasons set forth in the attached Opinion, and for good cause having been shown,

IT IS on this Third Day of January, 1994,

ORDERED that defendant's motion for judgment as a matter of law, pursuant to Rule 50(b), is denied; and it is further

ORDERED that defendant's motion for a new trial is denied, except that plaintiff must remit $97,500 of the mental distress award or submit to a new trial on the limited issue of damages; and it is further

ORDERED that plaintiff shall submit an amended form of judgment reflecting recalculation of prejudgment interest on the basis of the reduced mental distress award.