Donald H. YOUNG,

v.

LUKENS STEEL COMPANY
and Lukens, Inc.

Civ. A. No. 92–6490.

United States District Court,
E.D. Pennsylvania.

Nov. 22, 1994.

George P. Wood, Stewart Wood & Branca, Norristown, PA, for plaintiff.

Raymond A. Kresge, J. Anthony Messina, Pepper, Hamilton & Scheetz, Philadelphia, PA, for defendants.

## MEMORANDUM AND ORDER

HUTTON, District Judge.

Presently before the Court are the defendants Lukens Steel Company and Lukens,

Inc.'s (collectively "Lukens") Motion For A New Trial, or In The Alternative, For A Judgment As A Matter Of Law, defendants' Motion To Alter Or Amend Judgment, Or In The Alternative, Motion For Relief From Judgment, plaintiff's Motion To Mold The Verdict, plaintiff's Motion For Attorneys' Fees, and opposition thereto.

## I. BACKGROUND

In this action, Donald Young alleged, among other things, that Lukens terminated his employment because of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1). A seven day trial was held on plaintiff's ADEA claim between June 27, 1994 and July 7, 1994. After deliberating for a day, the jury found that Lukens had violated the ADEA and returned a verdict for the plaintiff in the amount of $477,856. The verdict consisted of an award of back pay of $190,-339, front pay of $283,682, and lost pension benefits of $3,835. The jury also found that Lukens had not willfully violated the ADEA, and thus, did not award liquidated damages.

On October 4, 1976, Lukens hired Young to work as a supervisor in its maintenance department. While employed by Lukens, Young received several promotions and salary increases, all of which occurred after he was forty years of age. Young's last promotion was in 1987, at which time he was promoted to the position of Superintendent of Assigned Maintenance. In late 1989, however, Young was replaced as Superintendent of Assigned Maintenance by Jack Moran ("Moran"), who was thirty-six years of age at the time. Moran had been promoted by Fred Smith ("Smith"), Manager of Maintenance. Smith was subsequently replaced as Manager of Maintenance by Mark Kamon ("Kamon"), who was thirty-six years of age at the time.

In 1991, Young, who now occupied the position of Superintendent of Trades and Crafts, reported directly to Kamon, who, in turn, reported to Smith, who then occupied the position of Vice President of Manufacturing for Lukens Steel. In September of 1991, Lukens Steel was involved in tense labor negotiations with the United Steelworkers of America and their Local 1165 ("the Union"), which represented hundreds of the company's hourly employees at the Coatesville, Pennsylvania steel plant. The negotiations concerned the parties' attempt to formulate a new collective bargaining agreement to replace the agreement that was to expire on October 1, 1991. The Union was threatening a strike. Kamon was a member of Lukens' collective bargaining committee and the Union's Vice–President, George Barrage ("Barrage"), was a member of the Union's bargaining committee.

When it began to appear that the parties would not be able to resolve their differences in time to avoid a strike, Lukens' management determined that it would be prudent to devise and discuss contingency plans to be employed in the event of a strike. In September, 1991, Moran prepared a one-page list of contingency plans, which, along with more general strike contingency plans, were disseminated as a packet by Moran to the four Maintenance Department Superintendents reporting to him, one of whom was the plaintiff.

At trial, Lukens contended that Young attempted to transmit these confidential strike contingency plans to the Union. According to Lukens, on September 17, 1993, Lois Miller, the Company's Industrial Relations Coordinator, who reported to Robert Miller, was routinely sorting and opening inter-office mail that she had retrieved from her mailbox when she discovered a hand-addressed inter-office envelope addressed to Barrage at the Union Hall. Upon opening the envelope, as was customary, she discovered a single-page typewritten note entitled "TWO FACES OF LUKENS MANAGEMENT," which contained disparaging remarks concerning the company's negotiations and which referenced the strike plans. According to Lukens, the envelope also contained a strike contingency plan. Lois Miller turned the envelope and its contents over to her superior, Robert Miller.

Robert Miller determined that the matter required further investigation. Accordingly, he turned the envelope and its contents over to Kamon. Kamon inquired of a number of maintenance department managers as to

whether anyone knew the sender. Moran conveyed to Kamon that he believed the handwriting on the envelope to be Young's. After noting the similarity between the handwriting on the envelope and a handwritten report, which Young had recently prepared, Kamon determined that a handwriting expert should be consulted. But first, Kamon advised his supervisor, Smith, of the developments. Smith, Kamon and Moran concurred in the decision to have the handwriting reviewed by an expert. On September 19, 1991, Kamon received the expert Robert O'Neill's report, which opined that Young's handwriting was, in fact, on the envelope.

Subsequently, Lukens' management decided to confront Young with its discovery and also decided to terminate his employment. Accordingly, on October 4, 1991, three days after the negotiations broke off and the Union went on strike, a meeting was held concerning Young. Present at the meeting were Kamon, Moran, a human resources counselor named Dale Cansler, and the plaintiff. At the meeting Young was told that he was being terminated by Lukens. The decision to terminate Young's employment was concurred in by Moran and Smith and was formally approved by Smith's superior, Lukens' Chief Executive Officer, Robert Schall.

At trial, Young flatly denied that he attempted to send the strike contingency plans to the Union. Lukens' employees regularly use inter-office mail to communicate with the Union. According to Young, on September 10, 1991, Mr. Robin Miller instructed him to return two grievances to Barrage through inter-office mail and he did so.

Young was terminated five days after turning fifty-five years of age. He was replaced by Richard Robidoux, who was thirty-six years of age at the time he assumed the duties formerly held by Young.

## II. DISCUSSION

### A. Defendants' Motion For A New Trial, Or In The Alternative, For Judgment As A Matter Of Law

■ The defendants' motion for a new trial is pursuant to Rule 59(a) of the Federal Rules of Civil Procedure. Rule 59(a) pro-vides in pertinent part that in an action which has been tried to a jury, "[a] new trial may be granted to all or any of the parties and on all or part of the issues ... for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States...." Fed. R.Civ.P. 59(a)(1). Although the rule lacks specificity, it is well-settled that a court may order a new trial if the verdict was against the weight of the evidence or if the court committed a significant error of law. *Maylie v. National R.R. Passenger Corp.*, 791 F.Supp. 477, 480 (E.D.Pa.), *aff'd*, 983 F.2d 1051 (3d Cir.1992). There are, of course, other grounds that a court may use to support an order for a new trial, but the two above-mentioned grounds are the only two upon which the defendants base their motion. *Id.*

### 1. Defendants' Claim That The Jury's Verdict Is Against The Clear Weight Of The Evidence

■ It is well-settled that the Court may grant a new trial if the verdict was against the weight of the evidence. *Shanno v. Magee Indus. Enterprises, Inc.*, 856 F.2d 562, 567 (3d Cir.1988). The decision to grant or deny a new trial is " 'confided almost entirely to the ... discretion ... of the trial court.' " *Id.* (*quoting Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980)). Because the Seventh Amendment guarantees the right to a jury trial, however, a jury's verdict is not to be lightly overturned on the ground that the verdict was against the weight of the evidence. *See Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir.1991). A " 'district court ought to grant a new trial on the basis that the verdict was against the weight of evidence only where a miscarriage of justice would result if the verdict were to stand.' " *Dunn v. HOVIC*, 1 F.3d 1362, 1364 (3d Cir.1993) (*quoting Williamson*, 926 F.2d at 1352); *see also Roebuck v. Drexel Univ.*, 852 F.2d 715, 735 (3d Cir.1988). This burdensome standard has evolved so as "to ensure that a district court does not substitute its 'judgment of the facts and the credibility of the witnesses for that of the jury.' " *Fine-*

*man v. Armstrong World Indus., Inc.,* 980 F.2d 171, 211 (3d Cir.1992) (quoting *Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 90 (3d Cir.) (in banc), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)). In reaching its determination, the Court must "view all the evidence and inferences reasonably drawn therefrom in the light most favorable to the party with the verdict." *Marino v. Ballestas,* 749 F.2d 162, 167 (3d Cir.1984) (*quoting Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1273 (3d Cir.1979)).

The defendants claim that the jury's finding of intentional discrimination was against the clear weight of the evidence.[1] Before reviewing the evidence, the relevant legal standard that the plaintiff had to fulfill must be articulated.

■■■ The analytical framework applied to this case is the *McDonnell Douglas/Burdine* "pretext" analysis. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In its recent decision in *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the Supreme Court reaffirmed and clarified the *McDonnell Douglas/Burdine* three-step burden shifting formula. Under *McDonnell Douglas,* the plaintiff bears the initial burden of establishing a *prima facie* case of age discrimination.[2] *Hicks,* —— U.S. at ——, 113 S.Ct. at 2747. If the plaintiff sustains his initial burden, then the burden of production shifts to the defendant to produce evidence "that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *Id.* (*quoting Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094). If the defendant sustains its burden of articulating a legitimate nondiscriminatory reason for the employment action taken, then the burden of production shifts back to the plaintiff and the plaintiff has the burden of proving both that the defendant's proffered justification is pretextual and that the adverse employment action was the product of unlawful intentional discrimination. *Id.*

In accordance with the above decisions and the United States Court of Appeals for the Third Circuit's decisions on the ADEA, this Court instructed the jury, on the second and third steps of the *McDonnell Douglas/Burdine* test (which defendants claim are erroneous), as follows:

DEFENDANTS' PROFFERED EXPLANATION

IF THE PLAINTIFF HAS ESTABLISHED ALL FOUR ELEMENTS [OF THE PRIMA FACIE CASE] BY A PREPONDERANCE OF THE EVIDENCE, YOU MUST THEN DETERMINE WHETHER THE DEFENDANT, LUKENS STEEL COMPANY, HAS PRESENTED A LEGITIMATE, NON-DISCRIMINATORY REASON FOR TERMINATING THE PLAINTIFF'S EMPLOYMENT. IN DETERMINING WHETHER THE REASON GIVEN FOR LUKENS' DECISION TO DISCHARGE THE PLAINTIFF WAS, IN FACT, A LEGITIMATE NONDISCRIMINATORY REASON, YOU ARE INSTRUCTED THAT AN OTHERWISE LEGITIMATE REASON DOES NOT BECOME ILLEGITIMATE MERELY IF IT TURNS OUT THE PLAINTIFF DID NOT ENGAGE IN THE CONDUCT WHICH FORMED THE BASIS OF THE DEFENDANTS' DECISION TO DISCHARGE HIM, SO LONG AS LUKENS' DECISION MAKERS HONESTLY BELIEVED THAT THE PLAINTIFF ENGAGED IN SUCH CONDUCT.

---

1. The defendants do not claim that the jury's finding that the plaintiff proved a prima facie case was clearly against the weight of the evidence.

2. To establish a prima facie case of age discrimination, the plaintiff must demonstrate the following four elements: (1) that he belongs to a protected class, i.e., that he is at least forty years of age; (2) that he was qualified for the position; (3) that he was dismissed despite being qualified; and (4) that he was ultimately replaced by a person sufficiently younger to permit an inference of age discrimination. *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1078 (3d Cir.1992); *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1214 (3d Cir.1988), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989); *see also Hicks,* —— U.S. at ——, 113 S.Ct. at 2747.

FURTHER, YOU MUST KEEP IN MIND THAT THE ULTIMATE BURDEN OF *PROVING* THAT THE PLAINTIFF'S AGE WAS A DETERMINATIVE FACTOR IN LUKENS' DECISION TO DISCHARGE THE PLAINTIFF REMAINS, AT ALL TIMES, ON PLAINTIFF YOUNG. THE DEFENDANTS' BURDEN, AT THIS STAGE, IS MERELY TO *ARTICULATE* SOME LEGITIMATE NON–DISCRIMINATORY REASON FOR DISCHARGING THE PLAINTIFF.

IF YOU FIND THAT THE DEFENDANT HAS PRODUCED EVIDENCE OF A LEGITIMATE, NON–DISCRIMINATORY REASON FOR TERMINATING THE PLAINTIFF'S EMPLOYMENT, THEN YOU MUST CONSIDER WHETHER THE PLAINTIFF HAS SUSTAINED HIS ULTIMATE BURDEN OF PROVING THAT THE DEFENDANTS INTENTIONALLY DISCRIMINATED AGAINST THE PLAINTIFF BY DISCHARGING HIM BECAUSE OF HIS AGE. AT THIS THIRD AND FINAL STAGE OF THE ANALYSIS, THE PLAINTIFF MUST PROVE THAT THE DEFENDANT'S ARTICULATED REASON FOR DISCHARGING THE PLAINTIFF IS A MERE PRETEXT FOR AGE DISCRIMINATION.

IF, ON THE OTHER HAND, YOU FIND THAT THE DEFENDANTS HAVE NOT PRODUCED EVIDENCE OF, THAT IS, STATED, SOME LEGITIMATE, NONDISCRIMINATORY REASON FOR DISCHARGING THE PLAINTIFF, THEN YOU MUST FIND FOR THE PLAINTIFF.

PRETEXT FOR AGE DISCRIMINATION

UNDER THE LAW, THE PLAINTIFF MUST PROVE THAT THE EXPLANATION OFFERED BY THE DEFENDANT WAS A MERE PRETEXT *FOR AGE DISCRIMINATION*. THIS MEANS THAT, IN ORDER TO FIND FOR THE PLAINTIFF, YOU MUST FIND BOTH THAT: (1) THE LEGITIMATE NONDISCRIMINATORY REASON OFFERED BY THE DEFENDANT IS NOT THE TRUE REASON THE PLAINTIFF WAS DISCHARGED; AND (2) THAT AGE PLAYED A ROLE IN THE EMPLOYER'S DECISION MAKING PROCESS AND WAS A DETERMINATIVE FACTOR IN THAT PROCESS.

IN DETERMINING WHETHER LUKENS' LEGITIMATE NON–DISCRIMINATORY EXPLANATION FOR ITS DECISION TO DISCHARGE THE PLAINTIFF IS PRETEXTUAL, YOU MAY NOT SECOND GUESS LUKENS' BUSINESS DECISION NOR QUESTION THE MEANS IT USED TO ACHIEVE A LEGITIMATE GOAL. FURTHER, UNDER THE LAW, LUKENS HAS THE RIGHT TO TERMINATE AN EMPLOYEE'S SERVICES FOR A GOOD REASON, A BAD REASON, OR FOR NO REASON AT ALL, AS LONG AS ITS REASON FOR DISCHARGING THE PLAINTIFF IS NOT THE PLAINTIFF'S AGE.

HOWEVER, IF YOU FIND THAT THE REASONS OFFERED BY LUKENS FOR TERMINATING YOUNG'S EMPLOYMENT WERE *NOT* THE TRUE REASONS FOR HIS DISCHARGE, THEN YOU MAY, ALTHOUGH, YOU ARE NOT COMPELLED TO, INFER THAT AGE WAS A DETERMINATIVE FACTOR IN THE DECISION TO TERMINATE THE PLAINTIFF'S EMPLOYMENT. IT IS FOR YOU TO DECIDE WHETHER THE PLAINTIFF WAS DISCHARGED BECAUSE OF HIS AGE. IN OTHER WORDS, EVEN IF YOU FIND THAT THE REASONS OFFERED BY LUKENS WERE NOT THE TRUE REASONS FOR THE PLAINTIFF'S DISCHARGE, IT IS POSSIBLE THAT HE WAS DISCHARGED FOR REASONS OTHER THAN AGE. ULTIMATELY, IT IS FOR YOU TO DECIDE WHETHER AGE WAS A DETERMINATIVE FACTOR IN THE PLAINTIFF'S DISCHARGE.

■ In accordance with *Hicks,* the jury instructions incorporated the oft-quoted language of *Hicks* regarding the permissible inferences a jury may draw regarding the

intentional discrimination requirement of *McDonnell Douglas* if it disbelieves the defendants' reasons for discharge. *See, e.g., Fuentes v. Perksie,* 32 F.3d 759, 763 (3d Cir.1994); *Armbruster v. Unisys Corp.,* 32 F.3d 768, 783 (1994); *Seman v. Coplay Cement Co.,* 26 F.3d 428, 433 (3d Cir.1994). Specifically, the Supreme Court in *Hicks* stated:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.

*Hicks,* —— U.S. at ——, 113 S.Ct. at 2742. Thus, because the jury found that the defendants' reason for discharge was a pretext, they could, but were not required to, infer that the defendants intentionally discriminated against the plaintiff.

■ It is important to also note before reviewing the evidence that since the defendants do not dispute the jury's finding on the prima facie case issue, its argument that the finding of intentional discrimination was against the clear weight of the evidence is flawed because proving a prima facie, in and of itself, can be enough evidence of intentional discrimination where, as here, the jury disbelieves the defendants' proffered reasons for discharge. *See Supra,* p. 968–969. The Court will, however, review the evidence because it seems that the real thrust of defendants' argument is not the finding of intentional discrimination, but rather that the jury's finding of pretext was against the weight of the evidence and thus, there could not have been any discrimination.

■ With the above admonitions regarding the standard for a new trial and for a violation of ADEA in mind, the Court concludes that the jury's finding that the defendants intentionally discriminated against plaintiff because of his age, was clearly not against the weight of the evidence. There was ample evidence upon which the jury could find or draw reasonable inferences

from that the defendants intentionally discriminated and that the defendants' proffered reason for plaintiff's termination was a pretext.

As mentioned above, the defendants' proffered reason for terminating the plaintiff was that he was untrustworthy because he attempted to pass along the confidential strike contingency plans. The plaintiff flatly denied ever sending the confidential strike plans and explained that it would be implausible to send the strike plans in the manner that the defendants claimed that he did. When questioned about sending the strike contingency plans, the plaintiff explained (and the jury could have reasonably believed):

> No I did not. You know, I think you know, you'd have to consider me stupid or crazy to do something like that. I had just finished 15 years of service with the company. I was proud of being there. You know, they were kind of number one in the steel industry, the specialty market plate business and, you know, over the years I had made friends, I was well respected with my peers and people I worked with. . . . I was planning basically to work close to 70 because I had started another family.
>
> And, You know, I don't know why I would take an envelope and write on it, in my handwriting, take some strike documents and place them in there [, the labor relations department's drop off of the open company mail system,] and then ask someone in labor relations how to mail it. You almost—I mean, its absurd that I would put my job in jeopardy like that especially with all the things that I had going for me at the time.

(Tr. 6/28/94 at 68–69).

Taken in the light most favorable to the plaintiff, as the Court must, the jury's finding of intentional discrimination and disbelief of defendants' proffered reason for plaintiff's termination were further supported by the following:

i) the plaintiff was put in charge of Defendants' steel plant after his superiors had concluded he was untrustworthy because he had attempted to disclose the strike plans;

ii) plaintiff had been an exemplary employee before he was terminated and had been promoted numerous times;

iii) the defendants had been planning a reorganization of the plaintiff's department before he was terminated;

iv) plaintiff's testimony that he discussed using age as a factor in making promotions with his Supervisor, Kamon;

v) Kamon told plaintiff that "he would be gone by the end of the year" and that plaintiff would not get certain promotions because of his age;

vi) evidence that Kamon had a list of employee's birthdays which he referred to when making employment decisions;

vii) plaintiff was provided with a set of strike contingency plans after his supervisors allegedly discovered that he had sent the past strike contingency plans;

viii) the strike plans that plaintiff allegedly attempted to send to the union were strike plans from past strikes;

ix) testimony by plaintiff that at the meeting at which plaintiff was terminated he was told by Mr. Kamon that he was not being terminated because he sent the strike contingency plans;

x) testimony at trial by Kamon that the plaintiff's alleged attempt to mail the strike contingency plans was "one of the reasons" he was terminated and that at an earlier deposition Kamon had stated that the attempt to send the strike plans was not the reason that plaintiff was terminated;

xi) testimony that Vice President Smith called plaintiff after he was terminated and told plaintiff that he would provide him with positive job references;

xii) contradictions in the testimony of the defendants' employees, other than plaintiff, regarding what actually was said at the meeting at which the plaintiff was terminated; and

xiii) testimony that plaintiff had earlier been replaced by the younger Moran as Superintendent of Assigned Maintenance in order to groom Moran for a promotion to Manager of Maintenance.

Although the above list does not recite all of the evidence that the jury could have reasonably based its conclusions that the defendants' proffered reason for termination of the plaintiff was a pretext and that the defendants intentionally discriminated, it illustrates that the jury's verdict was clearly not against the weight of the evidence. Based on the evidence introduced at trial, it is clear that allowing the jury's verdict to stand would not be a "miscarriage of justice." *Dunn v. HOVIC,* 1 F.3d 1362, 1364 (3d Cir. 1993) (*quoting Williamson,* 926 F.2d at 1352). Nor is there any basis for this Court to "substitute its 'judgment of the facts and the credibility of the witnesses for that of the jury.'" *Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 211 (3d Cir.1992) (quoting *Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 90 (3d Cir.) (in banc), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)).

### 2. *Defendants' Claim That They Are Entitled To A Judgment As A Matter Of Law*

In deciding whether to grant judgment as a matter of law, also known as judgment notwithstanding the verdict ("JNOV"), the court "must view the evidence in the light most favorable to the non-moving party, and determine whether the record contains the 'minimum quantum of evidence from which a jury might reasonably afford relief.'" *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 691 (3d Cir.1993) (*quoting Keith v. Truck Stops Corp.,* 909 F.2d 743, 745 (3d Cir.1990) (citations omitted)). Further, the court is not to weigh the evidence, determine the credibility of witnesses or substitute its judgment for that of the jury. *Id.* The court is not to enter JNOV "'unless the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief.'" *Dunn v. HOVIC,* 1 F.3d 1362, 1364 (3d Cir.1993) (*quoting Dawson v. Chrysler Corp.,* 630 F.2d 950, 959 (3d Cir.1980) (internal quotations omitted), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981)). In order to preserve an issue for judgment as a matter of law, the moving party must

timely move for a directed verdict and specify the grounds for the motion. Fed.R.Civ.P. 50(a); *Fineman,* 980 F.2d at 183.

 The evidence enumerated above provided the jury with ample evidence to afford relief under the relevant law. Moreover, the defendants failed to move for a directed verdict. Accordingly, the defendants' motion for JNOV is denied.

### 3. *Defendants' Motion For A New Trial Because The Court Erroneously Instructed The Jury*

Plaintiff claims that the jury instructions were erroneous in two respects. First, the defendants' claim that the Court failed to instruct the jury on the two-pronged third step of *McDonnell Douglas,* or as defendants term it the pretext-plus step, as described by the Third Circuit in *Seman v. Coplay Cement Co.,* 26 F.3d 428 (3d Cir.1994). Second, the defendants' claim that the jury should have been instructed on the "sole cause" standard enunciated in *Griffiths v. CIGNA Corp.,* 988 F.2d 457 (3d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993), not the standard enunciated in *Miller v. CIGNA Corp.,* 1994 WL 283269 (3d Cir. June 28, 1994). This claim is based on the notion that although *Miller* was controlling on the date that the jury was charged, *Miller* was subsequently vacated and scheduled for rehearing in banc by the Third Circuit, and thus, *Griffiths* once again reemerges as the controlling standard. *Miller v. CIGNA Corp.,* 1994 WL 420284 (3d Cir. August 12, 1994).

 The defendants' claim that the jury was erroneously instructed on the third step of *McDonnell Douglas* standard is without merit. As defendants point out, in *Seman* the Third Circuit stated the third step of *McDonnell Douglas* as follows:

> *Hicks* requires that once an employer has met its burden of proof of production by coming forward with a nondiscriminatory business reason for discharging a protected employee, the plaintiff-employee must then prove that the business reason was pretextual *and* that he was intentionally

discriminated on the basis of age. Proof of one without the other will not suffice.

26 F.3d at 438 (3d Cir.1994) (*citing Hicks,* —— U.S. at ——, 113 S.Ct. at 2742). In accordance with the above language this Court instructed the jury that:

> UNDER THE LAW, THE PLAINTIFF MUST PROVE THAT THE EXPLANATION OFFERED BY THE DEFENDANT WAS A MERE PRETEXT FOR AGE DISCRIMINATION. THIS MEANS THAT, IN ORDER TO FIND FOR THE PLAINTIFF, YOU MUST FIND *BOTH* THAT: THE LEGITIMATE NONDISCRIMINATORY REASON OFFERED BY THE DEFENDANT IS NOT THE TRUE REASON THE PLAINTIFF WAS DISCHARGED; *AND,* TWO, THAT AGE PLAYED A ROLE IN THE EMPLOYER'S DECISION MAKING–PROCESS AND WAS A DETERMINATIVE FACTOR IN THAT PROCESS.

(emphasis added). Comparison of the two above quotes clearly indicates that this Court correctly instructed the jury on the third step of *McDonnell Douglas.*

 It seems that the defendants are attempting, through artful semantics, to claim that because the Court included the *Hicks* permissible inference language in its instructions, the jury was erroneously instructed on the intentional discrimination requirement of the third step of *McDonnell Douglas.* Here, the jury disbelieved defendants proffered reasons, and thus, the jury could have inferred intentional discrimination with regard to the second prong of the pretext-plus standard. In *Fuentes v. Perksie,* 32 F.3d 759 (3d Cir.1994), the Third Circuit described the plaintiff's burden as:

> At trial, the plaintiff must convince the factfinder '*both* that the reason was false *and* that the discrimination was the real reason. The factfinder's rejection of the employer's proffered, legitimate reason *permits,* but does not compel, a verdict for the plaintiff. The test is whether the plaintiff ultimately persuades the factfinder that the employment decision was caused by bias, and for that purpose both the plaintiff's prima facie case and the

factfinder's rejection are circumstantial evidence of unlawful discrimination.

*Id.* at 763 (internal citations omitted); *see also Armbruster,* 32 F.3d at 782–83 (1994). Thus, simply because the *Hicks* inference language was included in the charge does not alter the fact that the jury was correctly instructed on the third step of *McDonnell Douglas.* In sum, the intentional discrimination prong (or, in defendants' words, the plus prong) of *McDonnell Douglas,* may be satisfied with the inferences of intentional discrimination a jury may draw from a plaintiff's prima facie case if the jury finds that the defendants' proffered reasons for the employment decision were a pretext.

The defendants' second alleged mistake in the instructions presents a novel, but easily answered question of law. In sum, the defendants' second claim is that because the jury was instructed under the standard for intentional discrimination articulated in *Miller,* which was vacated after the jury's verdict, the instructions on the intentional discrimination issue were erroneous.

▓▓▓ It is self-evident that a court should instruct a jury according to the controlling law at the time of the instruction. It is undisputed that *Miller* was the controlling precedent at the time the jury was instructed. Indeed, as the defendant states, "[a]t the time of the charging conference, a jury charge(s) based on the sole cause standard was grounds for reversal." (Defendant's Supplemental Reply at 3). This Court cannot now order a new trial based on a subsequent possible change in law. *Miller* was good law at the time the jury was charged. *Cf. U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership,* —— U.S. ——, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994). Were a district court to order a new trial every time a higher Court vacated or reversed a case upon which the district court relied at the time it instructed a jury, the lower courts would be thrown into chaos.

Moreover, simply because the Third Circuit vacated *Miller* does not mean that the sole cause standard is now the law in the Third Circuit. Contrary to defendants' arguments that this case is governed by the sole cause standard, the controlling law in the Third Circuit is still the standard articulated in *Miller.* In two cases which were decided after the jury in this case was charged and before *Miller* was vacated, the Third Circuit rejected the sole cause standard. *See Fuentes,* 32 F.3d at 764 ("To prevail at trial [in an ADEA pretext case], the plaintiff must prove not that the illegitimate factor was the *sole* reason for the decision, but that the illegitimate factor was a *determinative* factor in the adverse employment decision.") (emphasis in original); *Armbruster,* 32 F.3d at 778 ("In an ADEA case within the pretext framework, the plaintiff has retained the burden of persuading the jury that age actually played a role in the adverse employment decision and had a determinative influence on the outcome."). In addition, in *Armbruster,* the Third Circuit approvingly cited *Miller* and rejected the argument that the defendants are currently advocating. *Armbruster,* 32 F.3d at 768 n. 12. Specifically, the Third Circuit stated:

> Unisys [defendant] argues *Griffiths v. GIGNA Corp.,* requires a plaintiff in a pretext case to show "the discriminatory motive was the sole cause of the employment action." In *Miller v. GIGNA Corp.,* in distinguishing *Griffiths* and in commenting on its statement that illegal discrimination must be the "sole cause" of an employer's decision in a pretext case, we held, in light of the *St. Mary's,* that in a pretext case "the plaintiff's burden is to show that the prohibited consideration played a role in the decisionmaking process and that it was a determinative factor in the outcome of the process."

*Id.* (internal citations omitted). Accordingly, the defendants' request for a new trial based on erroneous jury instructions is denied.

### 4. Defendants' Claim That They Are Entitled To A New Trial Because The Court Excluded Defendants' Rebuttal Witness Mary Jo Ruczhak

Defendants next claim that the Court's exclusion of Mary Jo Ruczhak, a witness who was not listed in defendants' pretrial memorandum and whose testimony was first proposed on the fifth day of trial, was an error warranting a new trial. The defendants'

claim that Ms. Ruczhak's testimony would have rebutted plaintiff's claim that the list containing birth dates, which defendants claimed was used to send out birthday cards, was evidence from which the jury could infer age discrimination. Further, defendants assert that Ms. Ruczhak would have testified that she had in fact used the list to send out birthday cards to Maintenance Department Employees and that the plaintiff had been the person who started the practice of keeping lists of employee's birth dates.

Defendants' excuse for not having disclosed Ms. Ruczhak earlier is that it was surprised that the issue regarding birthday cards came up at trial.

█ The criteria for evaluating the introduction of the testimony of non-listed witnesses are:

(1) the prejudice or surprise in fact to the opposing party;

(2) the ability of the party to cure the prejudice;

(3) the extent of disruption of the orderly and efficient trial of the case; and

(4) the bad faith or willfulness of the noncompliant party.

*Beissel v. Pittsburgh and Lake Erie R.R. Co.*, 801 F.2d 143 (3d Cir.1986), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1296, 94 L.Ed.2d 152 (1987); *see also Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894 (3d Cir.1977). The Third Circuit has also indicated that a fifth factor should be considered: the importance of the excluded testimony. *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289 (3d Cir.1991); *see also Gant v. Klenzade, Inc.*, 155 F.R.D. 102 (E.D.Pa.1994).

█ The above factors weigh in favor of the Court's decision to exclude Ms. Ruczhak. First, and most importantly, plaintiff learned about the proposed witness on the morning of the fifth day of the trial, and thus, would have been unfairly prejudiced by the "surprise" witness. Second, the defendants were on notice of the birthday card issue because over five pages of Mr. Moran's deposition, which occurred over eight months before trial, were devoted to the issue and the issue was raised during Mr. Moran's testimony on June 30, 1994. Third, allowing a non-listed witness to testify on the fifth day of trial would have disrupted the trial because the plaintiff would have been entitled to sufficient time to prepare for the witness, which most probably would have required a continuance.

Finally, Ms. Ruczhak's testimony was not vital to defendants' case because the defendants could have elicited the information regarding the list in its examination of Mr. Moran. Accordingly, defendants' request for a new trial based on the exclusion of Ms. Ruczhak is denied.

### 5. Defendants' Request For New Trial Because The Court Refused To Submit Defendants' Exhibit 4 And 5 To The Jury Deliberation Room

█ The decision of whether or not to send an exhibit to the jury room lies within the sound discretion of the district court. *See United States v. Downen*, 496 F.2d 314 (10th Cir.1974); *Leonard v. General Motors Corp.*, 1990 WL 121543 (E.D.Pa. August 16, 1990); *Hughes v. Hemingway Transport, Inc.*, 539 F.Supp. 130 (E.D.Pa.1982). Refusal to submit certain evidence to the jury will constitute an abuse of discretion only if the refusal results in prejudice. *Downen*, 496 F.2d at 320; *Hemingway*, 539 F.Supp. at 132.

█ Here, the defendants claim that they were prejudiced by the court's refusal to allow defendants' Exhibit 4, a two-page report written by the plaintiff used by defendants' decisionmakers to compare plaintiff's handwriting with the writing on the interoffice envelope containing the strike contingency plans, and defendants' Exhibit 5, the report by defendants' handwriting expert concluding that it was plaintiff's writing on the interoffice envelope.

During a lengthy hearing on which exhibits should be sent to the jury deliberation room, this Court entertained numerous requests regarding which exhibits were to go to the jury deliberation room. Both parties had certain requests denied and certain requests granted. Now, defendants claim that allowing the two above-mentioned exhibits would be prejudicial. Defendants fail to point out

that there where many other exhibits that the Court ruled would not aid the jury. Considering the overall context of which exhibits were sent out and not sent out with the jury, it is clear that the defendants were not prejudiced. (*See* Tr. 7/6/94 at 93–145).

Specifically, defendants' Exhibit 4 was cumulative. The plaintiff had admitted that it was his handwriting on the interoffice envelope and the defendants' expert had testified about the exhibit. As to defendants' Exhibit 5, it too was cumulative because the defendants' expert had testified to the contents of the report. Accordingly, the Court finds no mistakes in its prior rulings on these exhibits and defendants' request for a new trial based on the exclusion of Exhibits 4 and 5 is denied.

## B. *Defendants' Motion To Alter Or Amend Judgment, Or In The Alternative, Motion For Relief From Judgment*

Defendants claim that the jury's front pay award should be reduced under Federal Rule of Civil Procedure 59(e) or 60 by the amount of back-pay the jury awarded, $190,339, because the total economic loss figure used by the jury was from the time the plaintiff was terminated, not from the time of the verdict. The defendants also claim that the jury's back-pay award should be reduced $53,295 to account for federal taxes the plaintiff would have paid had he remained employed by the defendants.

■ A jury's award of damages can only be reduced to the highest dollar amount that the jury could have properly awarded. *See Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir.1990); *Cartledge v. American Meter Co.*, 1988 WL 27007 at *2 (E.D.Pa. March 21, 1988), *aff'd*, 860 F.2d 1074 (3d Cir.1988); *see also* 11 C. Wright & A. Miller, *Federal Practice and Procedure*: Civil § 2815 at 104. Although jury verdicts can be disturbed when they are subject to mathematical calculations and there is a clear error in the calculation, *c.f. Scott v. Plante*, 641 F.2d 117, 137 (3d Cir.1981); *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1279 n. 19 (3d Cir.1979), in a case, such as the one at bar, involving disparate mathe-

matical calculations from which the jury may select, it is beyond the discretion of the court to say that the jury might have miscalculated when its final award was within the amount the jury could have properly awarded and there are no apparent miscalculations. Indeed, "it is well accepted that a court will not inquire onto the calculation methods employed by the jury during its deliberations." *Chuy*, 595 F.2d at 1279 n. 19; *see also United States v. Zauber*, 857 F.2d 137, 154 (3d Cir.1988 ("A jury is presumed to have acted rationally. We must assume that the jury followed the Court's instructions and arrived at a verdict based on those instructions."). In addition, " 'any ambiguity in what the claimant would have received but for the discrimination should be resolved against the discriminating employer.' " *Mason v. Association For Independent Growth*, 817 F.Supp. 550, 555 (E.D.Pa.1993) (*quoting Rasimas v. Michigan Dep't of Mental Health*, 714 F.2d 614, 628 (6th Cir.1983)).

■ Here, the jury was properly instructed that to calculate front-pay, it was to subtract the amount of compensation the plaintiff would have received from subsequent employers from the date of the jury's verdict up until the plaintiff retired, from the total compensation the plaintiff would have received from the defendants from the date of the jury's verdict until the plaintiff retired. The jury was further instructed that it could base its calculations using the age at which it thought the plaintiff would retire, but that the retirement age could not be more than seventy years of age. The jury interrogatory shows that the jury came to its award of front-pay of $283,682 by subtracting $507,097 from $790,779. Evidence presented by plaintiff's expert stated that the maximum plaintiff was entitled to if he retired at seventy years of age was $330,591. Defendants argue that the $790,779 total economic loss figure the jury used was a figure presented by defendants' expert, which calculated economic loss from the date the plaintiff was terminated up to age sixty-five and thus, the jury's award included the back-pay to which the plaintiff was entitled. However, it is beyond this Court's discretion to attempt to enter the jury deliberation room and guess

how and why the jury used the $790,779 figure, considering that the jury's final award was supported by the evidence and the jury's mathematical calculations were correct. Accordingly, the defendants' request for a reduction of the front-pay award is denied.

The defendants next claim that the jury's award of back-pay should be reduced by $53,295 to reflect income tax that the plaintiff would have had to pay on the award had he not been discriminated against. In the Third Circuit, ADEA judgments for back-pay are not taxable under the federal income tax laws because such judgments redress tort-like injuries.[3] *See Rickel v. C.I.R.*, 900 F.2d 655 (3d Cir.1990); *Abrams v. Lightolier Inc.*, 841 F.Supp. 584 (D.N.J.1994); *Murtha v. Forest Elec. Corp.*, 1992 WL 174606 (E.D.Pa. July 14, 1992). Although insulating ADEA back-pay judgments from taxes in essence gives the plaintiff a windfall, the Third Circuit explained that the ADEA and basic principles of tort law favor a successful plaintiff in an ADEA suit making "out better vis-a-vis federal income tax liability, than if the plaintiff had not been discriminated against in the first place." *Rickel*, 900 F.2d at 664. Certainly, it would be contrary to the policies underlying the ADEA to reward the windfall to a defendant who was found to have intentionally discriminated. *See Abrams*, 841 F.Supp. at 597; *Murtha*, 1992 WL 174606 at *11 ("The traditional rule is that the wrongdoing party pays damages to the injured party and the injured party gets the 'windfall.' Defendants' suggested approach to the issue—to reward the discriminating employer by allowing it to withhold federal taxes from the judgment without remitting the tax amount to the government—is certainly unique, but we are not persuaded that it is a sound method of deterring discrimination."). Accordingly, defendants' request to reduce the jury's back-pay award to reflect income taxes that the plaintiff would have had to pay on the award is denied.

### C. *Plaintiff's Motion To Mold The Verdict*

In this motion, the plaintiff requests that the Court order (i) prejudgment interest on the jury's award, (ii) post-judgment interest on the jury's award, (iii) an award to compensate for negative tax consequences the plaintiff will incur as a result of a lump sum payment of the award, and (iv) an award to compensate plaintiff for investment losses he incurred in attempting to mitigate damages.

It is well-settled that the award of prejudgment interest on a backpay award in an ADEA case is left to the discretion of the court. *See Gelof v. Papineau*, 829 F.2d 452 (3d Cir.1987); *Berndt v. Kaiser Aluminum & Chemical Sales, Inc.*, 789 F.2d 253, 259 (3d Cir.1986); *Wilson v. S & L Acquisition Co., L.P.*, 940 F.2d 1429, 1435 (11th Cir.1991); *E.E.O.C. v. U.S. Steel Corp.*, 728 F.Supp. 1167, 1169 (W.D.Pa.1989). "'The purpose of prejudgment interest is to reimburse the claimant for the loss of the use of the its investment or its funds from the time of loss to the time of judgment.'" *Berndt*, 789 F.2d at 259 (*quoting ARCO Pipeline Co. v. SS Trade Star*, 693 F.2d 280, 281 (3d Cir.1982)). Thus, prejudgment interest is limited to backpay and other types of remuneration that the plaintiff would have received before the verdict. Indeed, prejudgment interest should be presumed in backpay awards under the ADEA unless the equities require otherwise. *U.S. Steel Corp.*, 728 F.Supp. at 1169.

In this case, the defendants were found to have intentionally discriminated, and the defendants have failed to provide any credible reasons why it would be inequitable to award prejudgment interest on the plaintiff's back-pay award. Thus, the defendants shall pay prejudgment interest on the $190,339 award for backpay.

The applicable prejudgment interest rate is left to the discretion of the Court. *Gelof*, 829 F.2d at 456–67; *Sun Ship, Inc. v. Matson Navigation*, 785 F.2d 59, 63 (3d Cir. 1986). The Court finds persuasive the suggestion of the Third and Sixth Circuits that the district court look to the post-judgment interest rate contained in 28 U.S.C. § 1961

---

**3.** The Supreme Court recently granted certiorari to resolve a split in the circuits on this issue.

*C.I.R. v. Schleier*, —— U.S. ——, 115 S.Ct. 507, 130 L.Ed.2d 415 (1994).

when determining the applicable prejudgment interest rate. *See Sun Ship, Inc.,* 785 F.2d at 63; *E.E.O.C. v. Wooster Brush Co.,* 727 F.2d 566, 579 (6th Cir.1984). Accordingly, the prejudgment interest rate in this case shall be the 52–week Treasury Bill rate on the day of the judgment, which was 5.31%. *See* 28 U.S.C. § 1961(a). The interest shall be compounded annually. *See* 28 U.S.C. § 1961(b).

Contrary to § 1961, however, the interest rate shall be applicable only to the amount the plaintiff would have earned each year before the verdict plus interest and salary the plaintiff would have earned in all of the preceding years (*i.e.* compounded), instead of interest on the whole award annually. This distinction from § 1961 is necessary because a plaintiff's backpay award grows incrementally each year, whereas a plaintiff becomes entitled to the amount subject to post-judgment interest on the day of the verdict. Accordingly, the plaintiff is entitled to $18,-573 in prejudgment interest.[4]

Plaintiff next requests post-judgment interest on the jury's award. Defendants do not contest the awarding of post-judgment interest.

Post-judgment interest is governed by 28 U.S.C. § 1961. As mentioned above, § 1961 states that the interest rate to be used is the 52–week Treasury Bill price on the day of the verdict. On July 8, 1994, the rate was 5.31%. Accordingly, the plaintiff shall receive post-judgment interest at a rate of 5.31% compounded annually from July 8, 1994 on the award of $496,609.

Plaintiff next requests that this Court grant an additional amount of money to compensate for negative tax consequences associated with receiving payment of the verdict in a lump sum. This claim is without merit. As this Court held above, ADEA awards are not subject to Federal Income Taxes. *See Rickel,* 900 F.2d 655. Thus, the plaintiff's award will not be subject to any negative tax consequences. Accordingly, plaintiff's request for an award for negative tax consequence is denied.

Plaintiff next requests that he be awarded $50,000 to cover a loss he incurred when attempting to mitigate damages by investing in a business venture. This claim is *ipse dixit* that must be denied for two reasons. First, there is no basis in law or fact for this Court to grant this type of motion. The issue was not submitted to the jury and the Court cannot *sua sponte* increase a jury award based on an alleged investment loss that was not litigated. Second, in any event, plaintiff waived this claim by failing to disclose this alleged investment loss during the three year history of this case.

### D. *Plaintiff's Motion for Attorneys' Fees*

Pursuant to a stipulation entered into by the parties on July 21, 1994, the plaintiff shall have ten days from the date of this Memorandum and Order to file a more complete motion containing proper supporting documentation of his claim for attorneys' fees and costs, and the defendants shall have the

---

**4.** The calculations of prejudgment interest are as follows:

```
1991— 14,443(11 × 1313)
 × .0531
 767 × .21 (52/11) = 161
1992— 14,443 + 161 + 68,276 (52 × 1313) = 82880
 × .0531
 4401
1993— 82880 + 4401 + 68,276 (52 × 1313) = 155557
 × .0531
 8260
1994— 155,557 + 8260 + 36,764 (28 × 1313) = 200581
 × .0531
 10651
 × .54
 5751

 TOTAL = 18573
```

time provided by the local rules to respond to plaintiff's motion. Accordingly, plaintiff's present motion for attorneys' fees is denied with leave to renew.

An appropriate Order follows.

### ORDER

AND NOW, this 22nd day of November, 1994, upon consideration of the Defendants Lukens Steel Company and Lukens, Inc.'s Motion For A New Trial, or In The Alternative, For A Judgment As A Matter Of Law; Defendants' Motion To Alter Or Amend Judgment, Or In The Alternative, Motion For Relief From Judgment; Plaintiff's Motion To Mold The Verdict; Plaintiff's Motion For Attorneys' Fees; and opposition thereto, IT IS HEREBY ORDERED that the Defendants' Motion For A New Trial, or In The Alternative, For A Judgment As A Matter Of Law is **DENIED.**

IT IS FURTHER ORDERED that:

(1) Defendants' Motion To Alter Or Amend Judgment, Or In The Alternative, Motion For Relief From Judgment is **DENIED;**

(2) Plaintiff's Motion To Mold The Verdict is **GRANTED** in part and **DENIED** in part;

(3) Defendants shall pay an additional $18,753 for prejudgment interest on the jury's back pay award;

(4) Defendants shall pay post-judgment interest on the verdict at a rate of 5.31% compounded annually; and

(5) Plaintiff's Motion For Attorneys' Fees is **DENIED** with leave to renew.